UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALESHAHE LEMON,

       Plaintiff,                         Case No. 19-cv-11343
                                                Hon. Matthew F. Leitman

v.

THE CITY OF DETROIT, *et al.*,

       Defendants.

_____/

## ORDER GRANTING DEFENDANTS'
## AMENDED MOTION FOR SUMMARY JUDGMENT (ECF No. 25)

In 2018, Sharon Briggs accused Plaintiff Aleshahe Lemon of sexually assaulting her at his residence in the City of Detroit. On the morning after the alleged assault, Briggs gave police at least two statements detailing her allegations. City of Detroit police officer Martha Grace Willhelm later summarized Briggs' statements in a written Request for Warrant and Investigator's Report (the "Investigator's Report"). Willhelm then sought a warrant for Lemon's arrest by transmitting the Investigator's Report to a magistrate on the 36th District Court for the State of Michigan. Based upon Willhelm's summary of Briggs' statement in the Investigator's Report, the magistrate found probable cause to believe that Lemon had sexually assaulted Briggs, and she issued a warrant for Lemon's arrest. At Lemon's subsequent preliminary examination, Briggs testified against Lemon and

1

was subject to vigorous cross-examination. Based upon Briggs' testimony, the state district judge presiding over the preliminary examination found probable cause to believe that Lemon committed the sexual assault, and that judge bound Lemon over for trial. At Lemon's trial, a jury acquitted Lemon of all charges.

Lemon then brought this action against Willhelm, another officer, and the City of Detroit. Now remaining in the action are (1) Lemon's claims against Willhelm for false arrest, false imprisonment, and malicious prosecution in violation of both the Fourth Amendment and Michigan law and (2) Lemon's municipal liability claim against the City of Detroit. (*See* Am. Compl., ECF No. 19, PageID.303-312.)

Defendants have moved for summary judgment. (*See* Am. Mot. for Summ. J., ECF No. 25.[1]) They are entitled to that relief. One of the essential elements of Lemon's claims is that there was a lack of probable cause for his arrest and subsequent prosecution. But the two judicial determinations of probable cause described above preclude Lemon from establishing a lack of probable cause as a matter of law. Lemon therefore cannot succeed on his claims.

---

[1] Defendants initially filed a motion for summary judgment on June 1, 2020. (*See* Mot. for Summ. J., ECF No. 23.) They then filed an amended summary judgment motion on June 10, 2020. (*See* Am. Mot. for Summ. J, ECF No. 25.) Lemon moved to strike the amended motion, and the Court denied that request. (*See* Order, ECF No. 30.) Because the amended motion for summary judgment is the operative motion before the Court, the Court **TERMINATES AS MOOT** Defendants' initially-filed summary judgment motion (ECF No. 23).

Lemon counters that the probable cause determinations do not bar his claims because Willhelm intentionally and/or recklessly omitted key exculpatory evidence from the Investigator's Report.  While Lemon has raised some fair criticisms of the Investigator's Report – Willhelm's description of the evidence and offense surely could have been more thorough – Lemon has failed to show either that Willhelm omitted evidence with a culpable state of mind or that the omitted evidence was material to the finding of probable cause.  Thus, the omissions by Willhelm did not taint the judicial determinations of probable cause that are fatal to Lemon's claims.

Lemon also appears to argue that the judicial determinations of probable cause do not bar his claims because (1) they rested upon Willhelm's investigation and (2) the investigation was "completely flawed" and fell "short of the best practices articulated in the Michigan Model Policy for law enforcement response to sexual assault." (Am. Compl., ECF No. 19, PageID.298.)   Here again, there is merit to some of Lemon's criticisms of Willhelm.  Her investigation was no model for future sexual assault cases.  But Willhelm's failure to follow "best practices" does not negate the legal force of the probable cause findings that rested upon her investigation.

For these reasons, and those explained in more detail below, the Court **GRANTS** Defendants' motion for summary judgment.

**I**

**A**

During the summer of 2018, Briggs' sister Nicole was staying with Lemon at his residence on Minock Street in the City of Detroit. (*See* Prelim. Exam. Tr., ECF No. 25-1, PageID.495.)  On the evening of July 11, 2018, around 9:00 p.m., Briggs went to Lemon's residence to see and/or pick up Nicole. (*See* Report of Detroit Police Officer James Kimbrough, ECF No. 33-13, PageID.950.)  Nicole was not at the residence when Briggs arrived, but Lemon was there. (*See* Prelim. Exam. Tr., ECF No. 25-1, PageID.497.)  Briggs waited several hours with Lemon for Nicole to return. (*See id.*, PageID.496, 515.)   During that time, Briggs and Lemon each consumed several alcoholic drinks. (*See id.*, PageID.496-497, 515.)

When Nicole returned to Lemon's residence, Briggs asked Nicole to accompany her to a bar.  (*See id.*, PageID.518.)  Nicole agreed. (*See id.*)  The women then traveled to the bar, and Briggs consumed several additional alcoholic beverages at the bar. (*See id*.).  The women eventually returned to Lemon's residence. (*See id.*, PageID.519.)

Upon returning to Lemon's home, Briggs laid down on a mattress in the living room and fell asleep. (*See id.*, PageID.500.)  Lemon later ended up on the mattress with Briggs. (*See id.*, PageID.500-503.)  According to Briggs, Lemon sexually assaulted her by, among other things, penetrating her vagina with his penis and

without her consent. (*See id.*, PageID.500-503.)    According to Lemon, any sexual activity between he and Briggs was consensual. (*See* Briggs-Lemon Text Message Exchange, ECF No. 25-3, PageID.588, 592; Lemon Statement, ECF No. 25-12, PageID.685-686.)

## B

After the alleged assault, Briggs and Nicole left Lemon's residence and went to eat breakfast at a restaurant in the City of Berkley. (*See* Prelim Exam. Tr.., ECF No. 25-1, PageID.508.)  When they finished eating, Briggs exchanged a number of texts messages with Lemon. (*See* Briggs-Lemon Text Message Exchange, ECF 25-3.)  In those messages, Briggs accused Lemon of "rape." (*Id.*, PageID.587.)  She wrote that she "was sleeping and woke up to you inside of me." (*Id.*)   Lemon responded that the sexual activity was consensual: "U wasn't sleep u wanted this…u never said no u wanted me to fuk u… Did u say stop fucking u? Cause u know u liked it and if I raped u then why you just admit I came back when I was caught so that mean u was n yo [sic] right mind to notice what happened and u didn't disagree yup, my lawyer will see all this set up kitty booboo he'll just analyze your texts." (*Id.*, PageID.588, 592.[2])  During this text exchange, Briggs also said that "I will not report you if you leave [Nicole] alone." (*Id.*, PageID.587.)

---

[2] Lemon now claims that he did not mean that he and Briggs had sexual intercourse when he described their interaction as "fuk[ing]." (Lemon Dep. at 66, ECF No. 25-2, PageID.569.)  He says that his use of that term was a general reference to sexual

Following the exchange of text messages, Briggs placed three calls to 911 as she drove home. (*See* Prelim. Exam. Tr., ECF No. 25-1, PageID.509; *see also* Recorded 911 Calls, ECF No. 34, filed in the traditional manner.)   During the third call, Briggs pulled her car to the side of road, and she was met there by police officers. (*See* Prelim. Exam. Tr., ECF No. 25-1, PageID.509.)

**C**

After the police located and spoke with Briggs, she was taken to William Beaumont Hospital in Royal Oak.  (*See id.*, PageID.510.)   Detroit Police Officer James Kimbrough then traveled to the hospital and interviewed Briggs. (*See* Kimbrough Report, ECF No. 33-13, PageID.950.)    Kimbrough documented his interview with Briggs as follows:

> ARRIVED AT THE BEAUMONT HOSPITAL TO TALK WITH VICTIM (SHARON BRIGGS WF-[]) THAT TOLD SCOUT 1102A THAT SHE WAS SEXUAL ASSAULTED BY THE OFFENDER (LUCKY; UNKNOWN LAST NAME BM-39). VICTIM TOLD SCOUT 1102A THAT SHE WAS AT THE LOCATION OF 8311 MINOCK ST WHEN SHE WAS VISITING HER SISTER/WITNESS 1 (NICOLE BRIGGS WF-12-13-97). VICTIM TOLD SCOUT 1102A THAT SHE HAD BEEN WATCHING TELEVISION AND DRINKING WITH THE OFFENDER AND WITNESS 1 AROUND 9PM.  VICTIM 1 TOLD SCOUT 1102A THAT SHE DID NOT WANT TO DRIVE HOME

---

activity and that he did nothing more than perform oral sex on Briggs for a very short time and touch her vagina with his fingers. (*See id.* at 32, PageID.560.)

BECAUSE SHE DID NOT FEEL COMFORTABLE DRIVING AFTER SHE WAS DRINKING.   THE OFFENDER OFFERED THE VICTIM TO SLEEP ON THE MATTRESS IN THE FRONT LIVING ROOM OF THE LOCATION.

THE VICTIM DECIDED TO LAY DOWN AND SLEEP AT 4AM, UNTIL SHE WAS AWAKEN BY THE OFFENDER ON TOP OF HER AS SHE WAS LAYING FACED DOWN. THE VICTIM TOLD SCOUT 1102A THAT THE OFFENDER USED HIS FINGERS TO PENETRATE HER VAGINA, AND ALSO LICKING HER VAGINA BEFORE PENETRATING HER WITH HIS PENIS; AS SHE LAID FACED DOWN ON THE MATTRESS. VICTIM TOLD SCOUT 1102A THAT THE OFFENDER ATTEMPTED TO PENETRATE HER ANAL BUT WAS UNSUCCESSFUL. AFTER BEING SEXUALLY ASSAULTED IN WHICH THE VICTIM ESTIMATED TO BE 45 MINUTES BY THE OFFENDER, THE OFFENDER LEFT THE LIVING AND RETURNED 10 MINX LATER AND LAID NEXT TO HER AND BEGAN RUBBING HIS HANDS ON HER BACK. WHILE THE OFFENDER WAS RUBBING THE VICTIM'S BACK WHILE SHE WAS LAYING ON THE MATTRESS, WITNESS 1, WITNESSED THE OFFENDER RUBBING THE VICTIM'S BACK AND ASKED THE OFFENDER, "ARE YOU HAVING FUN RUBBING HER BACK?" THE OFFENDER THEN RESPONDED, "OH, I JUST LEFT OUT JUST TO SMOKE A JOINT." VICTIM 1 TOLD SCOUT 1102A THAT BOTH THE OFFENDER AND WITNESS 1 WENT BACK INTO THE BACK BEDROOM UNTIL THE OFFENDER LEFT THE LOCATION AT AN UNKNOWN TIME.

> VICTIM AND WITNESS 1 LEFT THE LOCATION
> AND WENT TO A CONEY ISLAND ON
> GREENFIELD AND 12 MILE RD, WHERE SHE TOLD
> WITNESS 1 THAT THE OFFENDER SEXUALLY
> ASSAULTED HER AT THE 8311 MINOCK
> LOCATION THIS MORNING AT 4AM, WHEN SHE
> WAS TRYING TO SLEEP ON THE MATTRESS.
> VICTIM TO SCOUT 1102A THAT SHE TEXTED THE
> OFFENDER ON HIS CELLPHONE AND ASKED HIM,
> "WHY DID YOU RAPE ME?"  VICTIM STATED
> THAT THE OFFENDER RESPONDED BY SAYING, "I
> DID NOT RAPE YOU, YOU WANTED IT."  AFTER
> THE VICTIM RESPONDED BY SAYING, "I DID NOT
> WANT IT, I WAS UNCONSCIOUS." THE OFFENDER
> DID NOT RESPOND.
>
> THE VICTIM STATED THAT SHE LATER CALLED
> 911 FROM AREA OF l-696 AND WOODWARD,
> WHERE SHE WAS MET BY MICHIGAN STATE
> POLICE, AND TRANSPORTED TO BEAUMONT
> HOSPITAL WERE SHE WAS BEING TREATED.
> SCOUT 1102 NOTIFIED CONTROL CENTER.

(*Id.*, PageID.950; grammatical errors in original.)

In addition, Briggs signed a handwritten account of the alleged assault. (*See* Briggs Statement, ECF No.33-17, PageID.1037-1042.)  In this statement, Briggs recounted that when she returned from drinking with her sister, she fell asleep in Lemon's living room and woke to find Lemon sexually assaulting her. (*See id*.) She reported that Lemon penetrated her vagina with his tongue, fingers, and penis. (*See id*.)

8

Briggs was also examined by a trained Sexual Assault Nurse Examiner.  The examiner then prepared a report of the examination (the "SANE Report"). (*See* SANE Report, ECF No. 46-1, PageID.1238-1247.)  The SANE Report contains Briggs' description of the alleged assault, depicts the areas of Briggs' body that were examined, and indicates that a number of specimens were collected for testing by the Michigan State Police. (*See id*.)  The SANE Report does not indicate whether the examiner looked for or found evidence of seminal fluid in or on Briggs' body. (*See id.*)

## D

On July 15, 2018 – three days after Briggs' report of the alleged assault – Willhelm was assigned to be the officer in charge of the investigation. (*See* Willhelm Dep. at 135, ECF No. 25-9, PageID.670.)  Willhelm first reviewed Briggs' interview statement. (*See* Willhelm Case Log, ECF No. 25-8, PageID.626.)  Willhelm next "called and spoke with" Briggs. (*Id.*)  Briggs told Willhelm that she "ha[d] text messages on her phone that she received from [Lemon] after [the alleged assault]." (*Id.*)  At that point, Willhelm recognized that she would "need to get" Briggs' cell phone "dumped." (*Id.*, PageID.627.)

During this same conversation, Briggs gave Willhelm Nicole's phone number. (*See id.,* PageID.626.)  Briggs also told Willhelm that she (Briggs) believed that while Nicole would "come in for a statement," Nicole would likely "lie and take

[Lemon's] side because she gets drugs from him." (*Id.*, PageID.627.)  Briggs also told Willhelm that Nicole had texted Lemon about the alleged assault after it occurred. (*See id.*)  Willhelm then recognized that she would have to "TYPE A SEARCH WARRANT FOR [Nicole's] PHONE and or [sic] SEIZE it if she comes in for interview." (*Id.*)

## E

On July 28, 2018, Willhelm called and spoke with Nicole. (*See id.*, PageID.635.)  Willhelm scheduled an in-person interview with Nicole for the next day. (*See id.*)  Shortly before the scheduled interview, Nicole called to say that she did not have a ride and needed to cancel the interview. (*See id.*)  Willhelm rescheduled the interview for July 30 (one day later). (*See id.*)  On July 30, Nicole neither appeared for the re-scheduled interview nor called Willhelm. (*See id.*, PageID.634.)  On August 1, 2018, Willhelm called Nicole again. (*See id.*, PageID.626.)  Nicole did not answer, and Willhelm was not able to leave a message. (*See id.*)

## F

On August 8, 2018, Willhelm completed the Investigator's Report, and it was delivered to the Wayne County Prosecutor's Office. (*See* Investigator's Report, ECF No. 25-10.)  In the section of the Investigator's Report captioned "DETAILS OF INVESTIGATION," Willhelm wrote the following:

**Crime:**

The complainant states the defendant, Aleshahe Lemon, woke her up from her sleep and forcibly sexually assaulted her by putting his tongue on her clitoris and in her vagina, he put his fingers in her vagina then put his penis in her vagina. The complainant states the defendant left, and when he returned to the room, he placed his hands on her buttocks and breasts.

**Circumstances:**

On July 12, 2018, the Detroit Police Department was dispatched to Beaumont Hospital for a rape report that occurred in the City of Detroit, County of Wayne and in the State of Michgian [sic]. The complainant, Sharon Briggs W/F/28, states on July 12, 2018, at 2 am she had dropped her sister, Nicole Briggs W/F/, off at 8311 Minock St., after a night of drinking. The complainant states her sister lives with Aleshahe Lemon, the defendant, at said address. The complainant states that she was condition to drive home, so the defendant advised her to sleep on the mattress located in the living room. The complainant states she fell asleep after 3 am, and was awoken when the defendant pushed her on her stomach, at which time he sexually assaulted her when he put his tongue on her clitoris and in her vagina, he put his fingers in her vagina, and then he put his penis in her vagina. The complainant states the defendant then ejaculated in her vagina and on her back. The complainant states the defendant then left and went into his room. The complainant states she, "Rolled up it the blanket and cried." The complainant states shortly after the defendant came back and he rubbed her buttocks and breasts with his hands. The complainant states her sister, Nicole Briggs, came into the room and after she stated, "Are you having fun looking at Lucky," the

defendant got up and went back to his room. The complainant states Nicole Briggs lay down next to her, and at this time she told her that the defendant had raped her. The complainant states her sister advised her to grab her stuff and they left the location.

Shortly after, the complainant was also taken to Beaumont Hospital where she was examined and a Sexual Assault Kit was completed. The Sexual Assault Kit was placed onto evidence 1807120155-1, and turned over to the Michigan State Police Forensic Science Division for testing.

On July 14, 2018, the Detroit Police Department 6th Precinct Special Operation Unit, made 8311 Minock St, to arrest the defendant on above sexual assault. The defendant did not answer the door for the Special Operations Unit.   The defendant's vehicle a beige, 2004, Ford, Freestar, Minivan, Plate #DGH5795, parked on the street, was towed for Uninsured Motor Vehicle. Per LEIN plate #DGH5795 showed a law enforcement confiscate notice of the license plate for fraudulent insurance.

On July 30, 2018, the complainant's sister was scheduled for an interview, but she failed to show or reschedule.

(*See id.*, PageID.674-675.)

While Willhelm did note in the Investigator's Report that Nicole failed to

appear for her interview, Willhelm did not list Nicole as a potential witness. (*See id.*,

PageID.676.)  Moreover, Willhelm had not taken a statement from Nicole prior to

submitting the Investigator's Report. In addition, at the time that Willhelm submitted

12

the Investigator's Report, she had not obtained any additional statements from Briggs (beyond the ones Briggs had provided other officers); had not obtained or listened to the 911 calls that Briggs placed after the alleged assault; and had not obtained text messages from Briggs' or Lemon's phones. (*See* Willhelm Dep. at 20, ECF No. 25-9, PageID.641.)

### G

When the Investigator's Report arrived at the Wayne County Prosecutor's Office, it was reviewed by Assistant Prosecutor Ralph Elizondo. (*See* Willhelm Case Log, ECF 25-8, PageID.634.) He did not immediately authorize the filing of charges. Instead, he gave Willhelm a list of additional tasks to complete. (*See id.*, PageID.628.) One of those tasks was to obtain the recordings of the 911 calls placed by Briggs shortly after the alleged assault. (*See id*.) Willhelm successfully obtained the recordings of the calls and delivered them to Elizondo. (*See id*.) But she did not listen to the recordings before she delivered them. (*See* Willhelm Dep. at 20, ECF No. 25-9, PageID.641.)

On or about September 27, 2018, Elizondo approved Willhelm's request for charges against Lemon. (*See* Willhelm Case Log, ECF 25-8, PageID.628.)

### H

After Elizondo authorized the filing of charges against Lemon, an application for a warrant to arrest Lemon was submitted to 36th District Court Magistrate Dawn

M. White (the "Warrant Application").  The Warrant Application was supported by the Investigator's Report.  Magistrate White reviewed the Investigator's Report, and based on that review, she found "probable cause to believe" that Lemon had sexually assaulted Briggs.[3] (*See* Arrest Warrant, ECF No. 39-1.)  Magistrate White then issued a warrant to arrest Lemon. (*See id.*)  The arrest warrant is dated September 12, 2018. (*See id*.)  Lemon was arrested pursuant to the warrant on September 28, 2018. (*See* Willhelm Case Log, ECF No. 33-8, PageID.859.)

# I

After Lemon was arrested, he gave a statement to police about his interactions with Briggs. (*See* Lemon Statement, ECF No. 25-12.)  Lemon claimed that Briggs initiated the sexual activity.  He said that she "seduce[d him] into giving her oral sex." (*Id*., PageID.685.)  He said he "didn't continue oral sex" because he "notice[d] a smell from her vagina." (*Id*.)  He then explained that after he stopped performing oral sex, Briggs "took [his] hand and placed it on her vagina to where my fingers played around her vagina" until Nicole objected. (*Id*.)  Lemon denied penetrating Briggs with his penis and said that while his tongue and fingers touched "around her

---

[3] The record does not contain either (a) a transcript of the proceedings that led to the issuance of the arrest warrant or (b) a copy of an affidavit submitted in support of the Warrant Application.  During an on-the-record Status Conference on January 11, 2021, counsel for both parties agreed that, for purposes of the pending motion, the Court may conclude that the Warrant Application was supported by the Investigator's Report and that Magistrate White decided to issue the arrest warrant based upon her review of the Investigator's Report.

clitoris area" and "around her lips," he did not put his tongue and fingers "in [Briggs'] vagina." (*Id.*, PageID.686.)  Finally, Briggs said that his semen would not be found in any samples taken from Briggs' during her examination by the SANE examiner. (*Id.*)

### J

On October 4, 2018, the Michigan State Police Laboratory completed certain testing on evidence that had been collected from Briggs when she was examined after the alleged assault. (*See* Laboratory Report, ECF No. 45-1.)  The State Police did not find any seminal fluid in Briggs' underwear, but they did find male DNA in both her underwear and on swabs taken from her inner genitalia. (*See id.*)  The DNA was sent for further testing (*see id.*), and that testing found "very strong support" for the conclusion that at least some of the DNA found in Briggs' genitalia came from Lemon. (Laboratory Report, ECF No. 43-1.)   According to Lemon, he must have left DNA in Briggs' genitals when he briefly performed consensual oral sex on her on the night of the alleged assault. (*See* Lemon Statement, ECF No. 25-12, PageID.686.)

### K

On November 15, 2018, Lemon appeared before 36th District Court Judge Deborah Lewis Langston for his preliminary examination on the charges against him arising out of his alleged sexual assault of Briggs.   Under Michigan law,

"[t]he purpose of [the] preliminary examination [was] to determine whether a crime was committed and whether there [was] probable cause to believe that [Lemon] committed it." *People v. Taylor*, 890 N.W.2d 891, 894 (Mich. App. 2016).

The prosecution called Briggs as a witness at the preliminary examination. She testified on direct examination that she went to sleep on a mattress in the living room of Lemon's house in the early morning of July 12, 2018; that she woke to find Lemon on top of her, holding one of her legs and lifting the other one; and that Lemon inserted his penis and fingers into her vagina without her consent. (*See* Prelim. Exam. Tr., ECF No. 33-15, PageID.986-992.)  Lemon's attorneys vigorously cross-examined Briggs, but they did not call any defense witnesses on Lemon's behalf. (*See id*., PageID.1000-1020.)

At the conclusion of the proofs, the prosecutor moved Judge Langston to bind the case over for a trial jury trial in the Wayne County Circuit Court. (*See id*., PageID.1020.)   The defense did not oppose the motion. (*See id.*)  On the contrary, the defense said that it had "no objection" to binding the case over for trial. (*Id.*) Judge Langston then bound the case over for trial.  In doing so, she necessarily found (as Lemon's counsel acknowledged at the hearing before this Court on December 1, 2020) that there was probable cause to believe that Lemon committed the alleged sexual assault of Briggs. !

16

**L**

Shortly before Lemon's trial was scheduled to begin, Lemon's defense attorney asked the prosecution to arrange to have Nicole served with a subpoena to testify at trial. (*See* Willhelm Case Log, ECF No. 25-8, PageID.630.)   Two police officers attempted to serve Nicole, but they were unsuccessful. (*See id*.)   After the failed attempt to serve Nicole, Nicole contacted Willhelm and told Willhelm that she would appear at the trial. (*See id*., PageID.624.)

Before Nicole testified, Willhelm took a statement from her.  In its entirety, that statement provided as follows:

> **Q:**  Can you tell me what you remember about the night involving Aleshahe Lemon and Sharon Briggs?
>
> **A:**  Sharon showed at my house, Lucky's house (Aleshahe Lemon) I wasn't there, which she knew, because I had a rental car at that time.  My rental car was not at Lucky's house, it was with me at Meijers.  And she was blowing my phone up, I didn't answer because I didn't want to hang out with her.  Lucky then called me, and I picked up the phone.  Lucky told me that Sharon was there and that we were supposed to hang out., and that she wasn't leaving until I got there.  I heard Sharon yelling in the background asking when I was coming home, she wants to hang out, etc.  I told her maybe the day before, but didn't confirm.  I got home probably around 8pm, it was just getting dark out.  Sharon wanted to go to her home bar in Berkleys, she said she had an open tab there, so that's why we had to go there.  Lucky told me that she had asked him if they could start drinking his pint that bought from the liquor store and she had it in her hand. She loves to drink that's her thing. I drove to Berkley where she had her open tab, we had some drinks, I ate a hamburger.  Later people at the bar

17

were telling me that she had too much to drink and to take her home.  2 hours later, I had to pay half her tab, but it was whatever I really wanted to go home.  On the way home she said she was hungry so we stopped at Taco Bell. We then went back to Lucky's at like 4am.  She sits on the floor, criss cross with no underwear on. I told Lucky to not give her anymore alcohol.  She begged Lucky to give her more alcohol.  Sharon was very drunk.  Lucky wasn't as drunk as I've seen him before, he was sitting down falling asleep in his chair.  I'm trying to get Lucky to get to the back with me.  I told her that she was too drunk to drive and I told her to sleep in the front room of the house.  She then takes off her dress, threw it on the floor, she did not have no bra, no panties, no nothing. She is naked. She lays down on the bed in front room, and wants us to fall asleep in the bed with her until she fell asleep.   She was mumbling at this time.  So we laid down with her.  When she started snoring I jabbed Lucky to go the back room with me.  Lucky goes back and forth between the room I was in and the front room where Sharon was at.  He finally goes to the front room where Sharon is at and I hear Sharon say, "Will you rub my back?" I followed Lucky to the front room, because Lucky was drunk and I didn't trust him. I'm hiding in the kitchen area and I saw the whole thing. Sharon had her butt covered with the covers, and he sat on her butt and massaged her back.  I let this happen for a couple minutes.  He was wearing his plaid pajamas and she had the covers over her butt, and the only thing exposed was her back.  I then jumped out and said to both of them, "Are you all having fun." They both jumped. Lucky stood up and walked his sorry ass back to the bedroom and flopped on the bed and he started snoring.  I then went to the front room to confront her and Sharon said, "He raped me.  He brutally raped me."  Her face was red, but there was no tears coming out.  She was acting nuts, she was still very drunk.  I told her let's go, let's go, and I'll take her out to eat.  I check on Lucky and he is still asleep on the bed.  It's around 7am.  She wanted to drive her car, and I told her to follow me in my rental.  We ate breakfast at L-George's (11 mile and greenfield).  It was

18

around 7:40 am when we got there.  At the restaurant she told me that he beat me up, he raped me, this happened for 45 minutes, thank goodness you woke up.  I was awake the whole time, I didn't even lay down, I didn't sleep at all until 3pm. I told her Sharon, you saw me. I was staring right at him. She got mad at me because I wasn't listening, because she was so full of crap. I paid for her breakfast and I told her to follow me to Aunt Marion's House, and then she took off and drove away. I guess she was mad at me for not listening to her.  It was around 8:30am.

**Q:** Did you see Lucky and Sharon have sexual intercourse?

**A:** No.  He can't really have sex when he is drunk.

**Q:** What was your relationship with Lucky at that time?

**A:** We were friends. We have had sex before. We weren't together at that time, but we had consensual sex.  He would have other girls over and have sex with them. We have been friends for 5 years.  If I was the only person there I would sleep in the back bedroom with him. The bed in the front room was for him whenever he had visitors over, and when his kids come over.

**Q:** Did you hear anything else about this incident after that night?

**A:** Sharon called me and FB messaged me later the next day, and for about a week. She kept saying that Lucky brutalized her, he raped her everyway and held her down.

(Nicole Statement, ECF No. 33-3, PageID.804-806.)

19

**M**

Lemon's trial began in early February 2019.  On February 14, 2019, a jury found Lemon not guilty of all of the charges against him. (*See* Register of Actions, ECF No. 13, PageID.690.)

**II**

Following Lemon's acquittal, he filed this action against the City of Detroit, Willhelm, and another Detroit Police Officer named Joseph Machon. (*See* Compl., ECF No. 1.)   The claims against Machon have been dismissed, and the only remaining defendants are the City of Detroit and Willhelm.

Lemon's current claims appear in his Amended Complaint. (*See* Am. Compl., ECF No. 19.)  A primary theme of that pleading is that Willhelm and the Detroit Police Department conducted a "completely flawed" investigation that fell "short of the best practices articulated in the Michigan Model Policy for law enforcement response to sexual assault." (*Id.*, PageID.298.)   Lemon complains, among other things, that Willhelm "deliberately failed" to timely interview Nicole and to obtain information from Nicole that would have confirmed his innocence, failed to follow-up on alleged inconsistencies in Briggs' statements to police and in her 911 calls, and failed to administer a polygraph examination to Lemon even though he had agreed to take one. (*See id.*, PageID.301-303.)   Lemon alleges that as a result of

20

these failures, he was arrested, incarcerated, and prosecuted without probable cause. (*See id.*)

In Lemon's Amended Complaint, he asserts the following claims:

- Count I – This claim, brought under 42 U.S.C. § 1983, alleges that Willhelm violated Lemon's rights under the Fourth Amendment by falsely arresting him, falsely imprisoning him, and maliciously prosecuting him.  Lemon further asserts that the City of Detroit is liable for Willhelm's constitutional violations because its failure to train and supervise Willhelm caused the violations.

- Count II – In this count, Lemon brings a state-law malicious prosecution claim against Willhelm and the City of Detroit.

- Count III – In this count, Lemon brought a state-law conversion claim against Willhelm and the City of Detroit.  This claim has been dismissed. (*See* Lemon Resp., ECF No. 33, PageID.769.)

- Count IV – In this count, Lemon brings a state-law false arrest and false imprisonment claim against Willhelm and the City of Detroit.

- Count V – In this count, Lemon brings a state-law intentional infliction of emotional distress claim against Willhelm and the City of Detroit. This claim has been dismissed. (*See id.*)

- Count VI – In this count, Lemon brings a state-law gross negligence claim against Willhelm and the City of Detroit.

Willhelm and the City of Detroit have moved for summary judgment on all of Lemon's remaining claims.  Willhelm argues that she has qualified immunity from

21

Lemon's federal claims and state-law immunity from Lemon's state-law claims. (*See* Am. Mot. for Summ. J., ECF No. 25, PageID.475-480, 485-487.)  She further contends that apart from her immunity, the claims fail on the merits because the arrest and prosecution of Lemon were both supported by probable cause. (*See id.*, PageID.480-484.)  The City of Detroit argues that it is entitled to summary judgment on Lemon's federal claims because Lemon has failed to show that his claimed injury was caused by a custom, policy, or failure to train. (*See id.*, PageID.471-475.)  The City of Detroit also argues that it has state-law governmental immunity from Lemon's state claims. (*See id.*, PageID.468-470.)

The Court held a video hearing on the motion on December 1, 2020.

### III

### A

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326–27 (6th Cir. 2013) (citing Fed. R. Civ. P. 56(a)).  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* (quoting *Tysinger v. Police Dep't of City of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find

22

for [that party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251–52. Indeed, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255.

## B

"Qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016) (internal quotation marks omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). Once raised, the "plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019).

The United States Court of Appeals for the Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [a court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014). The Court may answer these questions in any order, but "if either one is answered in the negative, then qualified immunity protects the official from civil

damages." *Brown*, 814 F.3d at 457. "[U]nder either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Indeed, "[o]n summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Brown*, 814 F.3d at 457 (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)).

## IV

The Court begins with Lemon's claim against Willhelm in Count IV for false arrest/false imprisonment in violation of the Fourth Amendment. In order to prevail on that claim, Lemon must prove, among other things, that Willhelm "lacked probable cause to arrest" him. *Voyticky v. Village of Timberlake, Ohio*, 412 F.3d 669, 677 (6th Cir. 2005). Lemon cannot make that showing here because he was arrested pursuant to a facially valid arrest warrant that was issued upon a finding of probable cause. Such a warrant is "normally a complete defense to a federal constitutional claim for false arrest or false imprisonment made pursuant to §1983." *Id*.

Lemon counters that his claims survive under an exception to this general rule. Under that exception, an arrest warrant does not bar a claim for false arrest/false imprisonment where the defendant "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions [in the warrant

application] that create[d] a falsehood" and where "such statements or omissions

[we]re material, or necessary, to the finding of probable cause" underlying the

warrant. *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010).  In order to prevail

under this exception where, as here, an officer asserts a qualified immunity defense,

"a plaintiff must establish: (1) a substantial showing that the defendant stated a

deliberate falsehood or showed reckless disregard for the truth and (2) that the

allegedly false or omitted information was material to the finding of probable cause."

*Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003).  In assessing the materiality of

a false statement or omission, a district court must "set aside the [false] statement[]

and include the information omitted in order to determine whether the affidavit is

still sufficient to establish probable cause." *Sykes*, 625 F.3d at 305.   In the qualified

immunity context, the question of whether an affidavit establishes probable cause

once omitted information is inserted into the affidavit is one "for the court." *Vakilian*,

335 F.3d at 517. *See also Kuslick v. Roszczewski*, 419 F. App'x 589, 593 (6th Cir.

2011) (explaining that in the qualified immunity context, "the issue of materiality is

one for the court.").[4]

---

[4] In *Gerics v. Trevino,* 974 F.3d 798 (6th Cir. 2020), the Sixth Circuit surveyed its
prior decisions concerning whether questions of probable cause are for the court or
the jury and held that whenever the historical facts are not in dispute, probable cause
is a question of law for the court.  That holding confirms that the specific question
before the Court here – whether probable cause would have existed if Willhelm had
included the omitted evidence in the Investigator's Report– is for the Court.  Indeed,
the question before the Court does not involve any disputed historical facts.  To

Lemon argues that the arrest warrant does not bar his false arrest/false imprisonment claims against Willhelm because Willhelm deliberately or recklessly made material omissions from the Investigator's Report.  More specifically, Lemon says that Willhelm, acting with the requisite state of mind, failed to obtain and/or mention in the Investigator's Report the following allegedly-exculpatory evidence: a statement from Nicole, a report showing that no seminal fluid was found in or on Briggs, recordings of the 911 calls made by Briggs, and the text messages between Briggs and Lemon. (*See* Lemon Resp., ECF No. 33, Page ID.773-774; Lemon Supp. Br., ECF No. 40, PageID.1196.)  Lemon also argues that Willhelm failed to inform Magistrate White about important conflicts in Briggs' statements to police investigators shortly after the alleged assault. (*See* Lemon Supp. Br., ECF No. 40, PageID.1194-1197.)  However, as explained below with respect to each piece of omitted evidence, Lemon has failed to make a "substantial showing" that Willhelm acted with the requisite state of mind and/or has failed to demonstrate that the evidence was "material to the finding of probable cause." *Vakilian*, 335 F.3d at 517.

***The Statement from Nicole.*** Lemon contends that Willhelm "deliberately" failed to interview Nicole during her investigation and purposefully failed to include

---

answer the question, the Court simply plugs back into the Investigator's Report the information and evidence that Willhelm failed to mention and then considers whether the addition of that information and evidence negates probable cause.  The Court need not resolve any disputed historical facts to complete that exercise.

a statement from Nicole in the Warrant Application. (*See* Am. Compl., ECF No. 19, PageID.298; *see also* Lemon Resp., ECF No. 33, PageID.773, 775.)   Lemon says that the omission of a statement from Nicole was material because Nicole had important "exculpatory evidence" to offer. (Lemon Resp., ECF No. 33, PageID.787.)   The Court is not persuaded by either aspect of this argument.

First, the undisputed evidence shows that Willhelm did not "deliberately" fail to interview Nicole.   Instead, Willhelm arranged more than one meeting with Nicole, and Nicole failed to show up for those appointments. (*See* Willhelm Case Log., ECF No. 25-8, PageID.635.) Thus, Lemon has not made a substantial showing that Willhelm intentionally (or even recklessly) avoided developing evidence from Nicole.

Second, Lemon has not shown that a statement from Nicole would have been material to the probable cause determination.   While Nicole would have denied that Lemon assaulted Briggs (*see* Nicole Statement, ECF No. 33-3, PageID.804-805), her account of the incident is not reliable.   Nicole claimed to have witnessed the "whole thing," and she insisted that Lemon did nothing more than "s[i]t on [Briggs'] butt and massage[] her back." (*Id*., PageID.805.)   But Lemon *admitted* that much more than that happened.   He first said that he "fuk[ed]" Briggs and later claimed that he had only touched her vagina with his fingers and briefly performed consensual oral sex on her.  (*See* Briggs-Lemon Text Message Exchange, ECF 25-

3, PageID.588, 592; Lemon Statement, ECF No. ECF No. 25-12, PageID.685.[5])

Nicole's insistence that there was no sexual contact between Lemon and Briggs

cannot be reconciled with any version of events given by Lemon, himself.  Nicole's

statement was plagued by internal inconsistencies as well.  She said both that Lemon

"wasn't as drunk as I've seen him before" and that Lemon "was" both sufficiently

"drunk" that she "didn't trust him" to behave appropriately and too "drunk" to "have

sex." (Nicole Briggs Statement, ECF No. 33-3, PageID.805.)  She said that she and

Lemon were "just friends" and "weren't together" at the time of the alleged assault

but that she nonetheless "confront[ed]" Briggs about receiving an intimate massage

---

[5] At the hearing on Defendants' motion for summary judgment, Lemon argued that in assessing whether Nicole's statement negated probable cause, the Court should not consider whether the statement conflicted with evidence obtained *after* Magistrate White issued the arrest warrant – evidence like Lemon's text messages and his statement to police.  Lemon argued that since the  later-acquired, conflicting evidence was not in Willhelm's possession at the time the arrest warrant was being sought, it (the evidence) would not have been presented to Magistrate White and thus could not have cast doubt on Nicole's reliability at the time Magistrate White assessed whether there was probable cause to arrest Lemon.  The problem with this line of argument is that it is inconsistent with Lemon's contention that if Willhelm had done a reasonable investigation and otherwise proceeded reasonably, she would have (and should have) obtained and included "in her warrant application" Nicole's statement *and* the text messages *and* a statement from Lemon. (Lemon Resp., ECF No. 33, PageID.773-774.)   Simply put, because Lemon contends that a proper warrant application would have disclosed Nicole's statement, the conflicting text messages, *and* a statement from Lemon that was inconsistent with Nicole's statement, it is appropriate to consider all of that evidence when considering whether Nicole's statement would have negated probable cause to arrest Lemon.

from Lemon. (*Id*.)  And she said that Briggs fell asleep so deeply that she was snoring but then somehow managed to ask Lemon for a back massage. (*See id.*)  For all of these reasons, Nicole's statement was not reliable and did not meaningfully undermine the probable cause established by Briggs' statements.

In sum, Lemon has failed to show that (1) Willhelm omitted Nicole's statement with the requisite state of mind and (2) Nicole's statement would have been material to a finding of probable cause.

***The 911 Calls Placed by Briggs*.**  Lemon argues that the calls Briggs made to 911 on the morning after the alleged assault undermine Briggs' credibility and negate the probable cause for his arrest that was established by Briggs' statements to police at the hospital on the morning after the alleged assault.  However, these calls do not cast any meaningful doubt on Briggs' account.

The Court has carefully listened to every second of every 911 emergency call placed by Briggs.  She comes across as a person who has suffered serious trauma.  Her voice cracks.  She screams.  She cries.  She seems to hyperventilate.  She fears interacting with male police officers.  The manner in which she presents herself supports, and does not undermine, her claim that she was assaulted.  Simply put, these calls reinforce, rather than undermine, the existence of probable cause.

Lemon counters that Briggs made several statements during the calls that substantially undermine her credibility.  The Court disagrees.  The statements by

Briggs on the 911 calls that Lemon identifies do not cast meaningful doubt on Briggs' credibility.  For instance, Lemon highlights Briggs' statement to the 911 operator that she had "passed out," and Lemon argues that since Briggs admitted to being "unconscious," Briggs could not possibly have a reliable "recollection[] of the incident." (Lemon Resp., ECF No. 33, PageID.783-784.)   But Briggs maintained that she regained consciousness once Lemon penetrated her (*see*, *e.g.*, Briggs-Lemon Text Message Exchange, ECF 25-3, PageID.587), and there is no substantial reason to believe that Briggs could not accurately remember being awakened by Lemon's unconsented-to penetration.  Indeed, it does not appear uncommon for victims of sexual assault who were penetrated while sleeping (after consuming alcohol) to recall important details of their alleged assaults.  *See, e.g., People v. Tatman*, 2009 WL 4163557 (Mich. Ct. App. Nov. 24, 2009) (affirming criminal sexual conduct conviction where victim testified that she fell asleep after drinking and awoke to the defendant sexually assaulting her); *People v. Hoskinson*, 2010 WL 5129891 (Mich. Ct. App. Dec. 16, 2010) (same); *People v. Connor*, 1997 WL 33350514 (Mich. Ct. App. May 30, 1997) (same); *People v. Smith,* 2018 WL 2370720 (Mich. Ct. App. May 24, 2018) (same).  Thus, Briggs' statement to the 911 operator that she had passed out prior to the alleged assault by Lemon would not have undermined the reliability of her account to such a degree as to negate probable cause.

Next, Lemon says that Briggs falsely told the 911 operator (on the first call to 911) that she (Briggs) was calling from a location in Shelby Township when, in fact, she was calling from "either Berkley or Royal Oak." (Lemon Resp. ECF No. 33, PageID.781, referencing 911 Recording at 3:23 – 3:52, ECF No. 34.[6])  It is not clear to the Court that Briggs misstated her location during the call.[7]  Moreover, even if she initially gave police an incorrect location, she correctly identified her location (as being in Royal Oak) less than ten minutes later (*See id.* at 7:50–7:57.), and she voluntarily met with officers in Royal Oak shortly thereafter.  (*See id.* at 10:32–10:39.)  She made no attempt to avoid questioning by officers.  On the contrary, she gave at least two statements within hours after making the 911 calls.  Under these circumstances, even if Briggs initially gave a wrong location during her first 911 call, that would not cast meaningful doubt on her core accusations against Lemon.

---

[6] Lemon also says that during Briggs' first call to 911, she falsely told the dispatcher that she was "calling from the scene of the incident." (Lemon Supp. Br., ECF No. 40, PageID.1195.)  That is incorrect.  During that call, Briggs told the dispatcher that she was driving around, not that she was at Lemon's residence on Minock Street in Detroit. (911 Recording at 1:00–1:12, ECF No. 34.)

[7] On the portion of the 911 recording cited by Lemon, Briggs appears to say that she is "on" Shelby Township, and she screams that "this stuff [– apparently a reference to sexual assault –] doesn't happen" in Shelby Township. (911 Recording at 3:23–3:27, ECF No. 34.) At several other points on the 911 recordings, Briggs makes this same point – that what happened to her does not happen in her hometown of Shelby Township. (*Id*. at 5:01–5:05.)  The reference to Shelby Township cited by Lemon may have been another attempt by Briggs to contrast Shelby Township and Detroit rather than an effort to identify her location.

Finally, Lemon argues that some of Briggs' statements to the 911 operators undermine Briggs' credibility because those statements conflict with testimony Briggs gave at the preliminary examination. (*See*, *e.g*., Lemon Resp., ECF No. 33, PageID.784.)  But Willhelm could not have noted in the Investigator's Report any conflict between the 911 calls and Briggs' later testimony because the preliminary examination happened long after Willhelm completed and submitted that report. Thus, Lemon has not shown that Willhelm wrongfully omitted from the Investigator's Report a reference to conflicts between Briggs' statements during the 911 calls and her preliminary examination testimony.

In sum, Lemon has failed to persuade the Court that he may escape the judicial determination of probable cause underlying the arrest warrant on the ground that Willhelm failed to mention the 911 calls in the Investigator's Report.

***The Text Messages Between Briggs and Lemon.***  Lemon argues that text messages exchanged between Briggs and Lemon on the morning after the alleged assault meaningfully undermine Briggs' credibility.  He contends that if Willhelm had mentioned the messages in the Investigator's Report, the report would not have established probable cause.  The Court disagrees.

Lemon highlights Briggs' statement to Lemon in their text message exchange that she (Briggs) "will not report you if you leave [Nicole] alone." (Lemon Resp., ECF No. 33, PageID.766, citing text message at 7:02 a.m., which is found at ECF

No. 33-9, PageID.863.)   Lemon argues that this statement seriously undercuts Briggs' credibility because it shows that Briggs "used the threat of [criminal] charges" to coerce Lemon "to allow Nicole to come live with her." (*Id.*, PageID.773-774.)   The Court concludes that this one statement by Briggs in the text exchange does not meaningfully alter the probable cause analysis for at least two reasons.

First, Lemon has not offered support for his interpretation of the statement by Briggs.  Briggs did not say, as Lemon claims, that she would decline to report Lemon to the police if Lemon would let Nicole "come live with her."  Instead, Briggs said only that she would not report Lemon if he left Nicole "alone." (Briggs-Lemon Text Message Exchange, ECF 25-3, PageID.587.)   And that statement does not cast substantial doubt on Briggs' version of events.  Indeed, one could easily envision Briggs' offer to forego charges as an effort to protect her sister by keeping Lemon away from her.

Second, even if Briggs' offer to forego charges, standing alone, could perhaps have raised some questions concerning the reliability of her account, the text exchange as a whole supports Briggs' claim that Lemon assaulted her.  For example, in the text exchange, Briggs contends that she "woke up to [Lemon] inside of me," that Lemon "raped" her, that Lemon is a "rapist," and that she did not "understand why [Lemon] did that to me." (*Id.*, PageID.587, 594.)   Given the totality of the text

exchange, Briggs' lone statement concerning her willingness to forego charges does not meaningfully undercut the reliability of her assault allegations.

*The Reports That Purport to Show an Absence of Seminal Fluid.* Lemon argues that Willhelm omitted from the Investigator's Report the fact that two reports revealed a lack of seminal fluid on or in Briggs after the alleged assault. (*See* Lemon Supp. Br., ECF No. 40, PageID.1196.) The reports on which Lemon relies are (1) the SANE Report and (2) a report by the Michigan State Police Laboratory. Lemon says that the purported findings of no seminal fluid in these reports were exculpatory because they conflicted with Briggs' statement that Lemon ejaculated in her vagina and on her back. (*See id.*) But Lemon has failed to show that Willhelm's omission of these reports from the Investigator's Report negate a finding of probable cause.

First, the SANE Report was not material to the question of probable cause because it did not undercut Briggs' statement that Lemon ejaculated. The SANE Report says nothing about the presence or absence of seminal fluid and gives no indication as to whether the SANE examiner attempted to make any determination as to whether seminal fluid was or was not present in or on Briggs.[8] (*See* SANE Report, ECF No. 46-1, PageID.1238-1247.) Accordingly, Willhelm's failure to

---

[8] The SANE Report indicates that the examiner took a number of swabs and samples to be tested by the State Police Laboratory at a later time, but the report does not indicate that the examiner attempted to draw any conclusion about whether seminal fluid was or was not present in or on Briggs.

mention the SANE Report does not negate the probable cause established by Briggs' statements.[9]

Second, Willhelm did not knowingly or recklessly omit from the Investigator's Report any exculpatory information from the State Police Laboratory report. Indeed, the State Police had not yet completed their analysis when Willhelm completed and submitted the Investigator's Report. She completed the Investigator's Report on August 9, 2018 (*see* Investigator's Report, ECF No. 25-10, PageID.674), and the request was transmitted to Magistrate White, at the latest, on September 12, 2018 (the day she issued the arrest warrant). But the State Police Laboratory did not complete its analysis and issue its report until several weeks later – on October 4, 2018. (*See* Laboratory Report, ECF No. 45-1, PageID.1226.) Under these circumstances, Lemon cannot show that Willhelm wrongfully failed to note the exculpatory nature of the report in the Investigator's Report. Thus, Lemon may

---

[9] In one of Lemon's supplemental briefs, Lemon submitted the SANE Report along with a declaration from the defense attorney who represented him at his criminal trial. (*See* Decl. of Lillian F. Diallo, ECF No. 46-1, PageID.1233-1236.) In the declaration, Diallo makes some general observations about sexual assault investigations and investigations by Sexual Assault Nurse Examiners. (*See id.*) Diallo also says that it can be "inferred" from the SANE Report that there was an absence of seminal fluid in or on Briggs, but Diallo also concedes that "there is no notation in the SANE exam report that there [was] no seminal fluid." (*Id.* at ¶6, PageID.1234.) The Court has carefully reviewed both (1) Diallo's statements about sexual assault investigations and (2) the text of the SANE Report, and the Court concludes that that evidence, taken together, does not support an inference that the SANE examiner made any determination as to whether there was seminal fluid in or on Briggs.

not avoid Magistrate White's probable cause determination on the ground that Willhelm did not tell Magistrate White about the State Police Laboratory Report.

*Briggs' Allegedly-Conflicting Statements to Police Investigators.* Lemon argues that Willhelm omitted from the Investigator's Report conflicting statements by Briggs that would have negated probable cause. (Lemon Supp. Br., ECF No. 40, PageID.1194-1197.) He insists that the Investigator's Report would not have established probable cause if it had identified the alleged conflicts. The Court disagrees with Lemon's assessment of Briggs' statements and concludes that the alleged conflicts in her statements would not have negated probable cause.

Lemon first points to Briggs' allegedly-conflicting statements concerning the issue of ejaculation. He says that when Briggs initially spoke to Officer Kimbrough, Briggs "never stated that [Lemon] ejaculated" (Resp., ECF No. 33, PageID.783), and he highlights that Briggs later claimed that he did ejaculate – inside her vagina and on her back. (*See id*.) But the two statements can be easily reconciled. Briggs mentioned Lemon's ejaculation in the second statement when she was specifically asked whether he had ejaculated. (*See* Briggs Statement, ECF No. 33-17, PageID.1040.) There is no indication that Officer Kimbrough asked about the issue of ejaculation. (*See* Kimbrough Report, ECF No. 33-13, PageID.950.) Thus, the fact that Briggs mentioned ejaculation in the second statement but not in the first does

not raise serious doubts about her veracity and does not meaningfully undermine probable cause.[10]

Lemon also highlights that Briggs gave differing accounts of what Nicole said when Nicole discovered Briggs and Lemon together in the living room. (*See* Lemon Supp. Br., ECF No. 40, PageID.1194.)  In one statement Briggs reported that Nicole said (to Briggs): "Are you having fun looking at Lucky?" (Briggs Statement, ECF No. 33-17, PageID.1041.)  In another Briggs told investigators that Nicole said (to Lemon): "Are you having fun rubbing her back?" (Kimbrough Report, ECF No. 33-13, PageID.950.)  While these two descriptions by Briggs of Nicole's statement are admittedly inconsistent, the inconsistency does not cast serious doubt in Briggs' core claim that Lemon penetrated her without her consent.

Next, Lemon notes that Willhelm failed to mention in the Investigator's Report an admitted lie by Briggs.  More specifically, Lemon points out that in Briggs' text messages to Lemon after the alleged assault, Briggs told Lemon that she had a recording of Lemon during the assault, but Briggs later admitted to Willhelm that she (Briggs) had lied about having such a recording. (*See* Lemon Supp. Br., ECF

---

[10] Lemon also suggests that Willhelm inaccurately told Magistrate White that Lemon ejaculated twice. (*See* Lemon Supp. Br., ECF No. 40, PageID.1195.) But Willhelm's report of the ejaculation matched what Briggs said.  Briggs reported that Lemon ejaculated "inside of me and on my back" (*see* Briggs Statement, ECF No. 33-17, PageID.1040), and Willhelm wrote in the Investigator's Report that Lemon ejaculated "in [Briggs'] vagina and on her back." (Investigator's Report, ECF No. 33-14, PageID.955.)

No. 40, PageID.1198.)  Lemon argues that probable cause would have been lacking if Willhelm had mentioned Briggs' admitted lie in the Investigator's Report.  The Court disagrees.  Briggs' lie did not relate to her core accusation that Lemon sexually assaulted her.  And Briggs did not tell the lie to police in an effort to bolster her story or make Lemon look guilty.  Instead, it is reasonable to conclude that Briggs told the lie in an effort to induce Lemon to admit the assault.  She may well have figured that he would be less likely to deny what he had done if he believed that she had conclusive evidence of his crime.  While this course of conduct by Briggs would have been deceptive, it does not cast serious doubt on her claim that Lemon raped her, and it would not have negated probable cause if it had been included in the Investigator's Report.

Finally, Lemon includes in his supplemental brief a chart that, he claims, reveals numerous additional and fundamental flaws in Briggs' story that Willhelm failed to note in the Investigator's Report. (*See* Supp. Br., ECF No. 40, PageID.1194-98.)  But the detailed chart looks like the work-product of a zealous criminal defense attorney who has carefully scrutinized the entire body of evidence against her client in the process of preparing a defense and effective cross-examination strategy.  This type of "fine-tooth combing over every detail seems more suited for arguments to the jury about why the government did not prove its case beyond a reasonable doubt than arguments to [a federal court] about why probable cause did not exist."

*Lester v. Roberts*, __ F.3d. __, 2021 WL 192725, at *8 (6th Cir. Jan. 20, 2021) (holding that inconsistencies in witness statements that officer allegedly failed to present to grand jury did not rebut presumption of probable cause that arose from grand jury indictment). Simply put, the chart does not reveal problems with Briggs' story that are so obvious, significant, or numerous that they undermine the probable cause established by Briggs' repeated statements that Lemon penetrated her without consent.[11]

*The Collective Impact of the Omitted Evidence.* For all of the reasons explained above, Lemon has failed to show that probable cause for his arrest would have been lacking if Willhelm had included in the Investigator's Report any of the individual pieces of evidence discussed above. Lemon has likewise failed to show that probable cause would have been lacking if Willhelm had included *all* of this evidence in the Investigator's Report. "Probable cause 'is not a high bar,'" *D.C. v. Wesby*, 138 S. Ct. 577, 586, (2018) (quoting *Kaley v. United States,* 571 134 S.Ct.

---

[11] To be fair, the Court asked Lemon to submit the supplemental brief highlighting the exculpatory facts known to Willhelm that Willhelm failed to mention in the Investigator's Report. The problem for Lemon is not that he submitted the facts in the chart format. It is, instead, that the chart uses the "fine-tooth comb" approach and highlights detailed and nuanced inconsistencies in Briggs' story – inconsistencies that are neither obvious nor obviously fatal to Briggs' account. Had Lemon's chart highlighted a number of obvious inconsistencies in Briggs' account that went to the core of her claim that Lemon assaulted her and that were known to Willhelm when she completed the Investigator's Report, then the chart may have succeeded in showing that the omitted inconsistencies negated probable cause.

1090, 1103 (2014)), and given the limited exculpatory value of each piece of evidence individually, the collective exculpatory weight of the evidence would not have been enough to negate the probable cause established by Briggs' clear, repeated statement that Lemon penetrated her without consent. The omitted evidence may well have provided fertile ground for cross-examination of Briggs at trial, but it did not sufficiently undermine her account so as to push that account below the modest bar that is probable cause. In short, the omitted evidence, as a whole, was not "material to the finding of probable cause" underlying the warrant for Lemon's arrest. For that reason – and because Lemon has failed to show that Willhelm omitted some of the evidence with a culpable state of mind – Magistrate White's finding of probable cause bars Lemon's claim for false arrest/false imprisonment. *Vakilian,* 335 F.3d at 517.

## V

The Court next turns to Lemon's claim against Willhelm in Count I for malicious prosecution in violation of the Fourth Amendment.[12] It is "certain" that this type of claim "fails when there was probable cause to prosecute" the plaintiff in state court. *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007).

---

[12] The Sixth Circuit has recently explained that "malicious prosecution" is the wrong name for a Fourth Amendment claim like this and that such a claim should properly be referred to as one for "unreasonable seizure." *Lester*, __ F.3d at __, 2021 WL 192725, at *5. However, since Lemon has used the term "malicious prosecution," the Court will use that term in order to make clear which claim it is addressing.

Here, the state district court's probable cause finding at the conclusion of Lemon's preliminary examination establishes as a matter of law that there *was* probable cause for Lemon's prosecution. *See Peet v. City of Detroit*, 502 F.3d 557, 566 (6th Cir. 2007) (holding that a finding of probable cause by a Michigan state court district judge at the conclusion of a preliminary examination precluded a plaintiff from establishing the lack of probable cause element of his malicious prosecution claim).  While the state court's finding would lack preclusive effect if Willhelm had presented false evidence to the state court and if the state court had "relied on that false information to determine that probable cause existed" *id*., that did not happen here.  Indeed, Willhelm neither testified nor presented any evidence at Lemon's preliminary examination.  Briggs was the sole prosecution witness, and the state district judge relied entirely on her testimony in finding probable cause that Lemon sexually assaulted her. (*See* Prelim. Exam. Tr., ECF No. 25-1.)  Because "there is no evidence in the record" that Willhelm "supplied the [] judge at [the preliminary] hearing with false information to establish probable cause," the probable cause finding at the preliminary examination is fatal to Lemon's malicious prosecution claim brought under the Fourth Amendment. *Id. See also Molnar v. Care House*, 359 F. App'x 623, 626-27 (6th Cir. 2009) (holding that a finding of probable cause by a Michigan state court district judge at the conclusion of a preliminary examination precluded a plaintiff from establishing the lack of probable

cause element of his malicious prosecution claim where defendant-detective did not testify at the examination and where probable cause finding rested upon testimony of victim); *Jordan v. City of Detroit*, 2012 WL 2526927, at \*\*5-8 (E.D. Mich. June 29, 2012) (reaching same conclusion where probable cause finding at conclusion of preliminary examination was based upon testimony of eyewitnesses and where officers did not testify at preliminary examination).

## VI

The Court next addresses Lemon's municipal liability claim against the City of Detroit. In that claim, Lemon alleges that the City of Detroit is liable for Willhelm's violation of his constitutional rights because it had a custom or policy of (1) failing to train its officers concerning how to conduct a sexual assault investigation and/or (2) failing to supervise its officers in the conduct of sexual assault investigations. This claim fails for two independent reasons.

First, as explained above, Lemon has failed to present a viable claim that Willhelm violated his constitutional rights, and "[a] municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers." *Blackmore v. Kalamazoo County,* 390 F.3d 890, 900 (6th Cir. 2004). Because Lemon has not shown that Willhelm (or any other employee or officer of the City of Detroit) violated his constitutional rights, the City of Detroit is entitled to summary judgment on his municipal liability claim.

42

Second, Lemon's municipal liability claim fails because he has not presented evidence that the City of Detroit had a custom or policy of failing to train or supervise its officers with respect to sexual assault allegations.  The only evidence in the record concerning training is Willhelm's testimony that the City of Detroit *did* provide her with at least some training related to sexual assault investigations. (*See, e.g.*, Willhelm Dep. at 108-09, ECF No. 25-9, PageID.663-664.)  Lemon has not presented any evidence that this training was inadequate.  Likewise, Lemon has not presented any evidence that the City of Detroit regularly failed to supervise its officers with respect to sexual assault investigations.  For this additional reason, Lemon's municipal liability claim fails as a matter of law.

## VII

The Court next turns to the apparent suggestion by Lemon that his federal constitutional claims may proceed because Briggs' investigation was "completely flawed" and fell "short of the best practices articulated in the Michigan Model Policy for law enforcement response to sexual assault." (Am. Compl., ECF No. 19, PageID.298.)  To be sure, Lemon has offered a reasonable critique of Willhelm's investigation.  He has fairly pointed out that she failed to take a number of recommended steps and failed to complete tasks that she personally slated for completion in her progress notes.

43

But the shortcomings in Willhelm's investigation, standing alone, do not support a claim for damages under Section 1983 because an "'incompetent or negligent investigation' is insufficient to establish a constitutional violation." *Garner v. Harrod*, 656 F. App'x 755, 761 (6th Cir. 2016) (quoting *Seigel v. City of Germantown*, 25 F. App'x 249, 250 (6th Cir. 2001)).  And, as described in detail above, Lemon has failed to show that any acts or omissions by Willhlem rose to the level of tainting the judicial findings of probable cause that are fatal to his claims. Thus, even if the Court were to share Lemon's view that Willhelm conducted a negligent investigation and that her work could have more thorough, the Court would still grant summary judgment in favor of the Defendants.

## VIII

Finally, the Court turns to Lemon's state-law claims for false arrest/false imprisonment and malicious prosecution.  Like Lemon's parallel federal claims, an essential element of these claims is a lack of probable cause. *See Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. App. 2003) (explaining that lack of probable cause is an element of a claim for false arrest/false imprisonment under Michigan law); *Matthews v. Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 603, 610 (Mich. 1998) (explaining that lack of probable cause is an element of a claim for malicious prosecution under Michigan law).  And like the parallel federal claims, these claims fail as a matter of law because the judicial

44

determinations of probable cause underlying the arrest warrant and the preliminary examination bindover preclude Lemon from establishing a lack of probable cause. *See Newell v. Allen*, 779 N.W.2d 91 (Mich. 2010) (directing dismissal of false arrest/false imprisonment claim where defendant-officer made the challenged arrest pursuant to a warrant and where the affidavit supporting the warrant was sufficient to establish probable cause even after the officer's allegedly-false statements were excised)[13]; *Harder v. County of Huron*, 2017 WL 1354085, at ** 6-7 (E.D. Mich. Apr. 13, 2017) (holding that Michigan state-law claim for malicious prosecution fails as a matter of law where state court judge found probable cause for the prosecution of plaintiff at a preliminary examination and where that finding was not tainted by false testimony/evidence provided by the defendant officer).[14]

---

[13] The factual background of the *Newell* decision is set forth in more detail in the Michigan Court of Appeals decision. *See Newell v. Allan*, 2009 WL 1913210 (Mich. Ct. App. July 2, 2009).

[14] *See also Autrey v. Stair*, 512 F. App'x 572 (6th Cir. 2013) (concluding that "rules of collateral estoppel applied in Michigan state courts would foreclose a litigant in a later-filed civil action from challenging a finding of probable cause previously made in a preliminary hearing during a criminal prosecution"); *Ellentuck v. Huntington*, 2018 WL 4339560, at ** 4-5 (Mich. Ct. App. Sept. 11, 2018) (holding that Michigan state-law claims for false arrest and malicious prosecution were barred by collateral estoppel where a state-court judge found probable cause for the prosecution of the plaintiff at a preliminary examination).

## IX

For the reasons explained above, the Defendants' Amended Motion for

Summary Judgment (ECF No. 25) is **GRANTED**.

**IT IS SO ORDERED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: February 1, 2021

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on February 1, 2021, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764